# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

————————————

Nº 05-CV-5117 (JFB) (SMG)

————————————

RACHEL RODRIGUEZ,

Plaintiff,

VERSUS

THE CITY OF NEW YORK, RAYMOND W. KELLY, NELDRA M. ZEIGLER, RAFAEL PINEIRO, DIANA L. PIZZUTI, DR. ELOISE ARCHIBALD, SCOTT T. LOOS, LOUIS CARABETTA, PATRICK ZWEIBEL AND SALEDINE PATEL , INDIVIDUALLY AND IN THE OFFICIAL CAPACITIES AS EMPLOYEES OF THE POLICE DEPARTMENT OF THE CITY OF NEW YORK,

Defendants.

————————————

MEMORANDUM AND ORDER
February 11, 2008

————————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Rachel Rodriguez ("Rodriguez" or "plaintiff") brought this action alleging employment discrimination on the basis of her race, color, national origin, gender, disability, hostile work environment, and retaliation, in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e *et seq.*, ("Title VII"), Title I of the Americans with Disabilities Act ("ADA"), the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1983 and 1985, and the New York State Human Rights Law, Executive Law § 269 *et seq.*, ("NYSHRL"),

against the following defendants: City of New York ("City"), Raymond W. Kelly, Police Commissioner ("Kelly"); Neldra M. Zeigler, Deputy Commissioner, Office of Equal Employment Opportunity ("Zeigler"); Rafael Pineiro, Chief of the Personnel Bureau ("Pineiro"); Diana L. Pizzuti, Deputy Chief, Commanding Officer of the Police Academy ("Pizzuti"); Dr. Eloise Archibald, Director of the Psychological Services Section ("Dr. Archibald"); Scott T. Loos, Deputy Inspector, Recruit Training School ("Loos"); Louis Carabetta, Lieutenant, Recruit Training School ("Carabetta"); Patrick Zweibel, Lieutenant,

Recruit Training School ("Zweibel"); and Saledine Patel, Sergeant, Recruit Training School ("Patel") (collectively, "defendants"). The individual defendants are charged individually and in their official capacities as employees of the Police Department of the City of New York .[1]

Defendants now move for summary judgment on all claims, pursuant to Fed. R. Civ. P. 56(c). For the following reasons, defendants' motion is (1) granted with respect to the ADA claim and municipal liability claims against the City, the Section 1983 conspiracy claim and the official capacity claims against all defendants, and all claims against defendants Kelly, Zeigler, Pineiro, and Pizzuti; (2) denied with respect to the Title VII and pendent state law discrimination claims against the City; and

(3) denied as to the Section 1981 and 1983 claims, as well as the pendent state law discrimination claims, against defendants Archibald, Zweibel and Sergeant Patel, in their individual capacity.[2]

## I. BACKGROUND

### A. FACTUAL BACKGROUND[3]

The facts described below are taken from the parties' depositions, affidavits, exhibits and defendant's Local Rule 56.1 statement of facts. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York,* 422 F.3d 47, 50 (2d Cir. 2001).

#### 1. Plaintiff's Initial Evaluation

Plaintiff served as a probationary police officer with the New York City Police Department ("NYPD") from July 2004 until her termination on April 15, 2005. (Defs.' Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Defs.' 56.1") ¶ 1.) In

---

[1] Plaintiff has clarified in her opposition brief that she has not asserted any Title VII and ADA claims against the individual defendants. (Pl.'s Br., at 22.) Accordingly, both the Title VII and ADA claims are only asserted against the City. Plaintiff also voluntarily withdrew all of her claims under § 1985 and all state tort law claims. (*Id.* at 23.) In addition, plaintiff voluntarily withdrew all claims against Loos and Carabetta. (*Id.* at 22-23.) Furthermore, with regard to the individual defendants sued in their official capacities, these claims are duplicative of the municipal liability claim lodged against the City under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) discussed *infra*. *See, e.g., Tsotesi v. Bd. of Educ.*, 258 F. Supp. 2d 336, 338 n.10 (S.D.N.Y. 2003) (dismissing claims against officials sued in their official capacities where plaintiff also sued municipality) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)). Therefore, the Court dismisses all claims against individual defendants sued in their official capacities. For the reasons discussed *infra*, however, certain of the claims against individual defendants in their individual capacity survive defendants' motion.

[2] Based on the evidence, discussed *infra*, viewed in a light most favorable to plaintiff, the Court finds that a reasonable jury could not find for plaintiff against the other defendants in their individual capacity. The only evidence against the other individual defendants is that they ratified the decision to terminate plaintiff through the chain of command. Accordingly, the Court dismisses all claims against defendants Kelly, Zeigler, Pineiro, and Pizzuti.

[3] Where only one party's 56.1 Statement is cited, the facts are taken from that party's 56.1 Statement, and the other party does not dispute the fact asserted or has offered no admissible evidence to refute that fact.

connection with her employment with the NYPD, plaintiff underwent an initial psychological screening by Dr. Maureen Creagh-Kaiser and was found to be "psychologically suitable." (*Id.* ¶ 3.) Plaintiff contends that Dr. Creagh-Kaiser, former Police Psychologist Level One, was not licensed in the State of New York at the time she performed plaintiff's initial evaluation. (Pl.'s Ex. A.) Dr. Creagh-Kaiser's recommendation was approved by defendant Archibald, one of the supervising licensed police psychologists. (*Id.*)

## 2. Plaintiff's Alleged Claustrophobia

In July 2004, plaintiff was assigned to the police academy for recruit training. (Defs.' 56.1 ¶ 4.) On November 19, 2004, plaintiff attended an "Emotional Disturbed Person" ("EDP") training workshop as part of her training for the police academy. (Id. ¶ 5.) The parties, however, dispute who was in charge of the EDP workshop. Defendants claim Sergeant Patel was in charge, while plaintiff claims no independent knowledge of that fact. (Pl.'s Ex. A, at 51.) As discussed *infra*, defendant's articulated, nondiscriminatory basis for terminating plaintiff focuses on the events of November 19, 2004. The evidence regarding the events of that day and the City's subsequent decisions related to those events are outlined below.

### (a) The Elevator

The EDP workshop was held on the sixth floor of the BMW Building, 555 West 57th Street, which is owned and managed by S.L. Green Realty Corp. (Pl.'s Ex. A, at 42-43; Ex. H, at 000150.) When plaintiff arrived at the BMW Building, she noticed a group of female recruits with whom she was "avoiding conflict" standing by the elevator. (Defs.' 56.1 ¶ 9.) Plaintiff asked a group of security guards if she could use the stairs instead. (*Id.* ¶ 10.) According to plaintiff, she requested to use the stairs in order to avoid that group of female recruits by the elevator with whom she previously had a conflict. (Pl.'s Ex. B, at 58:5-10.) The security guards did not allow her to do so because they did not have stair access. (Defs' 56.1 ¶ 10.) However, at that point, plaintiff noticed the group of female recruits was gone, so she proceeded towards the elevators. (Pl.'s Ex. A, at 58:5-10.)

Plaintiff encountered Police Officer Kelvin Liz in the lobby waiting for the next elevator. (Defs.' 56.1 ¶ 12.) Both Police Officer Kelvin Liz and Rodriguez heard former Security Officer Magdalena Vincente (a/k/a "Halliday") call to them, and saw her holding an elevator open. (*Id.* ¶ 13.) Plaintiff rode the elevator with Liz, Halliday and other passengers. Although plaintiff did not know the other passengers in the elevator, she thought they worked in the building. (*Id.* ¶ 14-15.) According to plaintiff, while she was talking to security guard Halliday, "[she was] very close to the elevator doors" and "while [they] were talking, [plaintiff] used [her] hands so [Halliday] says be careful with your hands because they have sensors." Plaintiff apologized and "put her hands back" and "took [her] duffle bag and [she] pushed it back as well." (Pl.'s Ex. D, at 59:8-12.)

According to plaintiff, on the ride up the elevator, Officer Halliday commented to plaintiff "so what is it, you don't like elevators?" to which plaintiff responded, "no." (Pl.'s Ex. D, at 59:3-8.) Officer

Halliday then said "Okay, this elevator, you know, they function fast" and plaintiff then said "okay." (*Id.*) Plaintiff testified that when the elevator arrived at the sixth floor, a lady exited the elevator and said to plaintiff "I don't like elevators because they're in enclosed areas and they make me feel x, y, and z."[4] (Defs.' 56.1 ¶ 18.) Plaintiff further testified that plaintiff was "perplexed" by the woman's statement and wondered why the woman was sharing it with her. (*Id.* ¶ 19.) Plaintiff guessed that the woman felt "compelled to say that she didn't like elevators" after hearing Halliday ask the plaintiff, "do you not like elevators for whatever reason." (*Id.*) Plaintiff and Police Officer Liz just nodded their heads and proceeded to the room for training. (Pl.'s Ex. D, at 59:18-25.)

(b)  Training Workshop

During the EDP workshop, plaintiff was asked to participate in a scenario that took place on a simulated subway car. (Defs.' 56.1 ¶ 22.) Plaintiff contends that she was not randomly selected, but instead was asked to participate in the scenario only after Sergeant Patel whispered in Police Officer Aquino's ear. (Pl.'s Ex. E.) Plaintiff's job during the scenario was to aid a woman who was acting out a panic attack. (Defs.' 56.1 ¶ 26.) During the scenario, plaintiff was complimented by Officer Aquino for the way she handled the aided person. (*Id.* ¶ 27.)

Defendant contends defendant Aquino was the instructor in charge of the scenario. (Defs.' Ex. A, at 46-49.) Although plaintiff

did not have any independent knowledge to confirm or deny who was in charge, plaintiff admits that former defendant Aquino was present during the scenario, as well as Police Officer Sumedo, a male instructor. (Pl.'s Ex. F, at 145-48.) Plaintiff participated in the scenario with three other officers, including female officer Martha Rodriguez. (Defs.' 56.1 ¶ 25.) The other members of plaintiff's recruit class were present during the scenario.

(c)  Post-Workshop Encounter

After the workshop ended, plaintiff was approached by Sergeant Patel. (Defs.' 56.1 ¶ 29.) Sergeant Patel advised plaintiff that "she had heard that [plaintiff] suffered a panic attack in the elevator." (*Id.*) Specifically, plaintiff testified that Sergeant Patel told her that "someone had approached her and had given her a description of someone with a gray shirt, short, at the time [plaintiff's] hair was blond, fair skinned and that had suffered a panic attack and she thought it was [plaintiff]."[5] (*Id.* ¶ 30.) Plaintiff was wearing her blue jacket zipped over her uniform which included a grey shirt. (*Id.* ¶ 20.) Plaintiff described her hair color at the time to be blonde and her complexion to be fair skinned. (*Id.* ¶ 21.)

Plaintiff told Sergeant Patel, "I believe you have the wrong person because I did not suffer a panic attack in the elevator." (*Id.* ¶ 30.) Sergeant Patel responded that she was sure it was plaintiff, and advised plaintiff that "if [she] had any conditions, that [she] should come forward and address them." (*Id.* ¶ 31.) Plaintiff further testified that

---

[4]  Plaintiff later learned the person on the elevator was actually an actress participating in the EDP workshop. (Defs.' 56.1 ¶ 18.)

[5]  Plaintiff described the actress, who was riding the elevator, as wearing a coat and scarf, and having brownish hair. (Id. ¶ 20.)

Sergeant Patel asked her if she reported her condition to the psychologist to which plaintiff said "no," and added, "[T]here's nothing to report. Therefore, I'm not going to say anything that has never existed in my life." (*Id.* ¶ 32.) According to plaintiff, Sergeant Patel was "really being pushy" during the conversation and stated "just say it, say it . . . why don't you just say I'm claustrophobic." (*Id.* ¶ 33.) Plaintiff refused. (Pl.'s Ex. G, at 55:4-8.)

Sergeant Patel told plaintiff that she should report the claustrophobia condition to the psychologist and also that she (Patel) was going to prepare a memo. (Defs.' Ex. A, at 68-69.) Sergeant Patel further told plaintiff that she was going to mention what happened that day in this memo, including the scenario and the panic attack in the elevator. (*Id.*) Plaintiff felt that Sergeant Patel's mind was already made up so she told her that "if that's what she felt it was the right thing to do, then to go ahead and do so."[6] (Pl.'s Ex. H, at 69:20-22.)

### 3. The Patel Memo

Sergeant Patel forwarded a memorandum, dated November 19, 2004 ("49 Memo"), to the Commanding Officer of Police Academy Recruitment that stated Rachel Nunez (a/k/a "Rodriguez") failed to disclose a medical condition of claustrophobia to the New York City Police Department. (Defs.' Ex. I.) Sergeant Patel also included that plaintiff disclosed to her that she was trapped in an elevator four years ago and had suffered a panic attack. (*Id.*) Plaintiff disputes that she made such statements. (Pl.'s 56.1 ¶ 40; Defs.' 56.1 ¶ 40.)

Approximately two weeks later, plaintiff was approached by Police Officer Richard Mendez, who told her that he read the 49 Memo wherein plaintiff "confessed [she] was claustrophobic." (Defs.' 56.1 ¶ 41; Pl.'s 56.1 ¶ 41.) On November 22, 2004, plaintiff spoke with Sergeant Rosado about the EDP workshop incident. (Defs.' 56.1 ¶ 43.) Plaintiff alleges that Sergeant Rosado asked her to come into her office, where she closed the door and stated, "These people do not operate in good faith. Do not expect a fair investigation. I think you should get yourself an attorney." (Pl.'s Ex. V, at 73-75.)

### 4. Psychological Evaluation

On November 26, 2004, plaintiff was directed to report to psychological services where she met with Dr. Maureen Gerise Creagh-Kaiser ("Dr. Creagh-Kaiser"). (Defs.' 56.1 ¶ 44.) Plaintiff contends, and Dr. Creagh-Kaiser testified, that Dr. Creagh-Kaiser was ordered by defendant Eloise M. Archibald to interview the plaintiff. (Pl.'s Ex. W, 21:3-8.) Plaintiff did not meet with defendant Archibald on November 26, 2004. (Defs.' Ex. A, at 77, 81, 104.) Plaintiff's memo book entry states that Dr. Creagh-Kaiser asked plaintiff "why did you Lie." (Defs.' 56.1 ¶ 47.) The entry also states, "I realized [Dr. Creagh-Kaiser] along with Sgt. Patel had made-up her mind about what-ever Sgt. Patel decided to write on the 49

---

[6] In addition, in her activity log dated November 19, 2006, plaintiff stated "while [in] conversation with Sgt. Patel I was able to tell that she had her mind set-up about me [sic] therefore I ceased the conversation especially when she mentioned that I had to speak with Chief Pizzuti about keeping my job." (Defs.' Ex. H, at 000151; Defs.' 56.1 ¶ 39.)

[49 Memo]. Sgt. Patel apparently wrote that I had confessed to her that I was treated medically for claustrophobic [sic] no such conversation took place. She also stated that I took a freight elevator. No such event happened." (*Id.* ¶ 47.)

During this meeting, Dr. Creagh-Kaiser questioned plaintiff about the 49 Memo and plaintiff testified that she advised Dr. Creagh-Kaiser that if she wanted the truth about what happened during the scenario she should "investigate any [of the] other 38 [recruit] members that were there." (Def.'s Ex. A, at 78.) Plaintiff denied that she suffered a panic attack, that she had claustrophobia, that she was treated for claustrophobia, or that she took medications. (Defs.' 56.1 ¶ 49.) Plaintiff revealed that she used to be a flight attendant prior to her work at the police academy. (*Id.* ¶ 50.)

Plaintiff discussed with Dr. Creagh-Kaiser a 1999 incident where she was stuck in the elevator of her apartment building while pregnant. (*Id.* ¶ 51.) Specifically, around June or July of 2000 when plaintiff was seven months pregnant, she was by herself and got stuck in an elevator between floors for about fifteen to twenty minutes. (*Id.* ¶ 52.) Plaintiff pressed buttons for the alarm, the lobby, and the nineteenth floor, where she lived. (*Id.*) The doors of the elevator were jammed, so plaintiff "pried [them] open with [her] hands and [she] got out." (*Id.*) Plaintiff testified that, although she was "stressed and 'pretty upset'" by the event, she did not panic. (*Id.* ¶ 53.) She felt "a little apprehensive" about elevators for about a month or so following the incident, but eventually continued taking elevators. (*Id.* ¶ 54.) Plaintiff testified that she did not previously disclose this incident to the

NYPD "because, I mean, there's so many things that occur in your life, what are the chances of you remembering everything in specific. So at the time, you know, I didn't remember the incident." (*Id.* ¶ 55.) Plaintiff did not report this incident to her gynecologist. (*Id.* ¶ 56.)

## 5. Plaintiff's Removal

On November 26, 2004, the same date as plaintiff's psychological evaluation, Dr. Eloise M. Archibald ordered the removal of plaintiff's firearms for "the purpose of a psychological evaluation" and had plaintiff placed on Restricted Duty "pending the results of the evaluation." (Pl.'s Ex. BB; Ex. CC, at 267-71.) Defendants dispute who issued the order, contending that Dr. Creagh-Kaiser (not Dr. Archibald) ordered the firearm removal and placed plaintiff on restricted duty. (Defs.' Ex. K.)

### (a) The Investigation

Dr. Creagh-Kaiser conducted an investigation relating to plaintiff's alleged claustrophobia. The evidence she relied upon in making her final recommendation is summarized below:

### (1) Patel's Submissions

Sergeant Patel submitted the 49 memo disclosing plaintiff's alleged claustrophobia, as discussed *supra*. Plaintiff contends that Doctors Creagh-Kaiser and Archibald spoke with Sergeant Patel on November 26, 2004 about the 49 statement (Pl.'s Ex. DD; Ex. EE.) Defendants contend that only Dr. Creagh-Kaiser spoke to Sergeant Patel. (Defs.' Ex. M; Ex. B, at 49.)

### (2) Halliday's Submissions

On December 21, 2004, Dr. Creagh-Kaiser had a phone conversation with security guard Halliday. Dr. Creagh-Kaiser's notes of the phone conversation reflect that security guard Halliday reported that plaintiff told her that she was claustrophobic. (Defs.' Ex. Q.) Halliday also submitted a handwritten note, dated December 21, 2004, to the police department through Sergeant Patel regarding the November 19, 2004 events (Pl.'s Ex. N; Ex. S; Ex. T), although plaintiff disputes the accuracy of that statement. Halliday testified that she wrote the statement herself after the doctor "told me what she needed, how did she [plaintiff] act that was about it." (Defs.' Ex. C, at 33, 44, 46.) Halliday also testified that she identified plaintiff by name in her December 21 memorandum only because plaintiff's name was given to her by Sergeant Patel.[7] (*Id.*, at 32, 55, 56, 58, 61, 63; Ex. D, at 18.) At the request of the doctor, Halliday further submitted an addendum dated January 26, 2005, to her December 21, 2004 memo. (Defs.' Ex. U.) In this addendum, Halliday stated that she asked plaintiff if she was claustrophobic and plaintiff responded "yes." (Defs. Ex. C, at 62.)

With respect to the events of November 19, 2004, Halliday further testified that she recalled an incident with a rookie police officer who she described as "[p]etite size, she had like dirty blondish hair, ponytail,

---

[7] Halliday testified that she was not asked to report to the sixth floor to confirm that the cadet in question who had the panic attack was the plaintiff, nor was Halliday shown an actual academy photograph of the plaintiff. (Defs.' Ex. C, at 50, 61, 63; Defs.' Ex. 1, at 17-18.)

complexion white." (Defs.' Ex. C, at 30-31.)

### (3) Aquino's Submissions

On November 30, 2004 Dr. Creagh-Kaiser spoke with Police Officer Aquino. Police Officer Aquino related that plaintiff told her that she was claustrophobic and that plaintiff "really feels it is not a big deal." (Defs.' Ex. N.) By memoranda dated December 6, 2004, defendant Aquino submitted information concerning the November 19, 2004 EDP workshop to the Commanding Officer, Medical Division, Police. (Defs.' Ex. P.) The statement submitted by Aquino alleges that plaintiff admitted that she was claustrophobic and could control it in stressful situations. (*Id.*)

Dr. Creagh-Kaiser also had a phone conversation with Police Officer Moore-Killman from the Police Academy Human Resources Command. (Defs.' Ex. P.) In her notes from the conversation, Dr. Creagh-Kaiser reported that she received the 49 Memo from Sergeant Patel and was instructed to write a referral and sent plaintiff to NYPD psychological services. (*Id.*)

By memoranda dated March 8, 2005, Dr. Creagh-Kaiser, in consultation with her supervisor, Dr. Archibald, assessed plaintiff by reviewing the memoranda submitted by Sergeant Patel, Aquino, and Halliday, as well as her interview of plaintiff. (Defs. Ex. V; Ex. B, at 40, 51, 56, 131-34, 145, 158-59, 259.) Dr. Creagh-Kaiser assumed that the memoranda submitted by Sergeant Patel, Aquino, and Halliday were true. (Defs.' Ex. B, at 49, 51-53, 73, 75, 77, 89, 107, 137, 313-14.) She testified that she assumed that

plaintiff had a motive to cover up her condition in order "to be fully sworn in as an officer." (*Id.* at 53, 331; Defs. Ex. G, at 256.)

(b) Dr. Creagh-Kaiser's Recommendation

In her March 8, 2005 memorandum, Dr. Creagh-Kaiser made a recommendation to terminate plaintiff from the NYPD based on the following:

> Overall, 3 security guards working at John Jay College on November 19, 2004, where NYPD Academy training was taking place, Police Officer Aquino, and Sgt. Patel all reported the PPO's grave difficulty with elevators, and the PPO's report to PO Aquino and Sgt. Patel, specifically, that she is claustrophobic. And, PPO Nunez is denying each of the respective accounts of the incidents and statements that took place on November 19, 2004. This dynamic lends grave question to the PPO's credibility. Furthermore, the PPO's reported level of distress upon entering an elevator and while conducting the scenario poses question for her ability to tolerate the stress of police work. While the PPO clearly denied experiencing difficulty with closed spaces and claustrophobia, the reported actions and behaviors that she took part in are contradictory to the psychological resources required by police officers. Therefore, it is recommended that PPO Rachel Nunez be separated from police work.

(Defs.' Ex. V.)

Dr. Creagh-Kaiser's recommendation to terminate plaintiff from the NYPD was subsequently endorsed by defendant Archibald, and then through the chain of command until it was finally approved by the NYPD's Chief of Personnel on April 14, 2005. (Defs.' Ex. V, Ex. F, at 125-26; Ex. G, at 231, 483.)

Neither Dr. Creagh-Kaiser nor Dr. Archibald questioned the authors of the respective memoranda to ascertain "their veracity for telling the truth in these statements that were given to the police department," nor did they contact any members of plaintiff's recruit class that attended the EDP workshop or perform a comprehensive "investigation." (Defs. Ex. B, at 23-24, 49, 89, 92; Ex. F, at 40-47; Ex. G, at 232, 233, 261, 266-68, 272-73, 278, 283-84, 289, 297-98, 309-11.)

6. Restricted Duty

Plaintiff's interactions as a recruit for the NYPD, specifically her experience while on restricted duty, are also part of plaintiff's claims in this action. As such, the Court has reviewed the evidence relating to these interactions in evaluating plaintiff's claims for discrimination and hostile work environment. A summary of such evidence is outlined below.

(a) Comparators

According to the defendants, a former male Police Officer (hereinafter, "C.S.") was similarly placed on psychological hold due to his alleged failure to disclose to the NYPD that he received psychological

treatment. (Defs.' Ex. A, at 85-89.) Plaintiff testified that C.S. admitted to her that he lied on his pre-employment application by failing to disclose prior treatment for a mental condition, but that members of the police academy staff tried to protect him because he was "blond hair and blue eyed." (*Id.*) Defendants produced evidence that Police Officer C.S. resigned from the NYPD on June 2, 2005, without the consent of the Police Commissioner, in lieu of being decertified by the Department of Citywide Administrative Services. (Defs.' Ex. AA; Ex. A, at 87.)

Plaintiff, C.S., and other recruits who were either injured or pregnant remained on hold after their academy class graduated. (Defs.' Ex. A, at 88-89.) Plaintiff and C.S. were the only two psychological holds. (Defs.' Ex. Z.) Plaintiff is a Spanish female. (Defs.' 56.1 ¶ 83.) Probationary police officers C.S., Miller, Maria, and Teta were all male. (*Id.* ¶ 82.) Plaintiff testified that Maria was Spanish, Miller was Black, and C.S. and Teta were Caucasian. (*Id.*) Plaintiff further testified that probationary police officers Liz and two or three other females were held over due to pregnancy – one was Spanish and the other two were Black. (*Id.*)

(b) Plaintiff's Assignments at the Police Academy

Plaintiff claims that she had to perform all assignments in uniform, while Caucasian officers were allowed to wear plain clothes. (Pl.'s Ex. OO, at 45-52; QQ, at 116-32.) In January 2005, plaintiff alleges that she, C.S., and other minority officers were ordered to measure and draw floor plans for the academy. (Defs.' 56.1 ¶ 86.) Defendants

contend this was because the academy did not have blueprints.[8] (Defs.' Ex. A, at 89-90, 93; Ex. E, at 28, 36, 39-40, 89; Ex. H, at 000207-213; Ex. FF, at 21.) Plaintiff also testified that C.S. was not disciplined for not performing such a task or for wearing plain clothes.[9] (Defs.' Ex. A, at 98.)

Plaintiff further testified that "[a]fter [C.S.] decided he was no longer partaking of the measuring, Zweibel took it upon himself to make me his secretary." (Defs.' 56.1 ¶ 91.) Specifically, plaintiff contends she was ordered by defendant Zweibel to get his lunch from the Blooming Farm House, answer his phone, count toilets, urinals, showerheads, and sinks on every floor, and to input this information in a spreadsheet. (*Id.* ¶ 92.) Plaintiff's memo book reflects that she picked up food for Zweibel on five occasions, on February 9th, 10th, 11th, 14th, and 18th, in the year 2005. (*Id.* ¶ 93.) Plaintiff had to re-do all floor plans after Zweibel told her the first drawings "weren't good enough." (*Id.* ¶ 94.)

The female recruits who were on hold-over due to pregnancy were assigned to the library, either filing or assisting with books.

---

[8] Plaintiff contends in her 56.1 Statement that defendants already had blueprints of the police academy and that they were given to plaintiff by Deputy Inspector Ringwald when he found out that Zweibel ordered plaintiff to perform such a task. (Pl.'s 56.1 ¶ 86.) However, plaintiff does not point to any evidence in the record to support such a statement.

[9] There is also evidence that, on January 10, 2005, Sgt. Harrison asked plaintiff and C.S. to clean out rooms on the fifth floor. (Defs.' Ex. H, at 000208.) However, plaintiff testified that Lieutenant Carabetta asked her to do so. (Pl.'s Ex. A, at 112.)

(Defs.' Ex. A, at 90.) Plaintiff testified that recruit Miller was also assigned to do "runs" on occasion that plaintiff described as either "getting the meal or the lunches from the seminars to just set up the room for the conferences." (Defs.' 56.1 ¶ 96.) Plaintiff testified that Miller was also assigned to assemble the NYPD Patrol guide. (*Id.* ¶ 97.) On February 1, 8, and 9, 2005, plaintiff was also assigned patrol guide related work. (*Id.* ¶ 98.) Plaintiff testified that on January 12, 2005, NYPD recruit operations ordered all of the hold over recruits to clean the entire gymnasium. (*Id.* ¶ 99.) Thus, on January 12, 2004, plaintiff cleaned the gym and typed a memo for Detective Davis. (Defs.' Ex. H, at 000208.)

Defendants state that the NYPD's assignment of police officers to custodial duties is neither a violation of the collective bargaining agreement between the City of New York and the union representing police officers, nor the NYPD's own rules and procedures. (Defs.' Ex. BB.) However, plaintiff disputes this. (Pl.'s 56.1 ¶ 90; Defs.' 56.1 ¶ 90.)

Plaintiff testified that, when Zweibel was not satisfied with her work, "he would slam his hand on the table, he would take the documents and throw them right beside me for a sense of intimidation and said, I asked you, in a high pitched voice to do this. And he'll pound on the material, And I want this ace up, and just very hostile." (Defs.' 56.1 ¶ 100.) Plaintiff testified that this happened two or three times. (*Id.*) Plaintiff also testified that on two or three occasions when individuals asked if plaintiff was able to assist in other projects defendant Zweibel said "she's mine" and "don't even look at her, I got her first, She's mine, She's my

girl." (Defs.' 56.1 ¶ 101.) Plaintiff was "embarrassed" by Zweibel's comments. (*Id.* ¶ 102.)

## B. Procedural History

On March 28, 2005, plaintiff sent a letter to the NYPD Office of Equal Employment Opportunity ("EEOC"). On May 17, 2005, plaintiff filed a complaint with the EEOC, alleging discrimination based on race, retaliation, color, sex, and national origin.

Plaintiff filed a complaint in this action on November 2, 2005, within 90 days of receiving her right to sue letter from the EEOC. The case was originally assigned to the Honorable I. Leo Glasser and, on January 23, 2006, the case was reassigned to the undersigned. Defendants subsequently moved for summary judgment. Oral argument was held on November 30, 2007.

## II. Discussion

### A. Summary Judgment Standard

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2004).

The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted); *Tufariello v. Long Island R.R.*, 364 F. Supp. 2d 252, 256 (E.D.N.Y. 2005). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted). The Second Circuit has provided additional guidance regarding summary judgment motions in discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g. Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)).

### B. DISCRIMINATION CLAIMS

Plaintiff claims that she was terminated on the basis of her race, color, and national origin. Defendants argue that Rodriguez's

discrimination claims relating to her termination fail as a matter of law because the undisputed facts demonstrate that she was terminated for legitimate, non-discriminatory reasons. For the reasons set forth below, the Court finds that summary judgment on these claims is unwarranted.[10]

### 1. Legal Standard

Because plaintiff presents no direct evidence of discriminatory treatment based on her race, the Court reviews her claim under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). To establish a *prima facie* case of discrimination under Title VII, a plaintiff must show (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 567 (2d Cir. 2000). The Second Circuit has characterized the evidence necessary for the plaintiff to satisfy this initial burden as "minimal" and "de minimis." *See Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).

Once plaintiff establishes a *prima facie* case, the burden shifts to the defendant to "'articulate some legitimate, nondiscriminatory reason for the' termination." *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 (1996)). If the defendant carries that burden, "the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Patterson*, 375 F.3d at 221 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). "'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Patterson*, 375 F.3d at 221 (quoting *Texas Dep't of Cmty. Affairs*, 450 U.S. at 253).

To meet this burden, the plaintiff may rely on evidence presented to establish her *prima facie* case as well as additional evidence. Such additional evidence may

---

[10] In addition to alleging claims under Title VII, plaintiff alleges discrimination under 42 U.S.C. § 1981 and New York State Human Rights Law ("NYSHRL"). The same standards apply to a discrimination claim under § 1981 and NYSHRL. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989) (relating Title VII and section 1981 claims); *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1046 (2d Cir. 1992) (relating Title VII and NYSHRL claims). Thus, the Court analyzes the § 1981 and the NYSHRL claims in conjunction with the Title VII claim. In addition, although individual defendants may not be held personally liable for alleged violations of Title VII, under certain circumstances, an employee may be held individually liable under § 1981 and NYSHRL. *See Chamblee v. Harris & Harris, Inc.*, 154 F. Supp. 2d 670, 676-77 (S.D.N.Y. 2001) (noting that an employee may be held individually liable under NYSHRL if he has "sufficient authority and power to do more than simply carry out personnel decisions made by others"); *Sutherland v. N.Y.S. Dep't of Law*, No. 96 Civ. 6935 (JFK), 1999 WL 314186, *7 (S.D.N.Y. May 19, 1999). For the reasons set forth *infra* with respect to the Title VII claim against the City, defendants' motion as to the 1981 and NYSHRL claims is also denied on the same grounds.

include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101 (2003). It is not sufficient, however, for a plaintiff merely to show that he or she satisfies "*McDonnell Douglas's* minimal requirements of a prima facie case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000). Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. *See id.*; *Connell v. Consol. Edison Co. of N.Y., Inc.*, 109 F. Supp. 2d 202, 207-08 (S.D.N.Y. 2000).

As the Second Circuit observed in *James*, "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove – particularly discrimination." 233 F.3d at 157; *see Lapsley v. Columbia Univ.*, 999 F. Supp. 506, 513-16 (S.D.N.Y. 1998) (advocating elimination of *McDonnell Douglas* test in favor of simplified approach focusing on ultimate issue of whether sufficient evidence exists to permit jury to find discrimination); *see also Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.").

## 2. Application

At the outset, the Court finds that plaintiff has made out the *prima facie* case required by *McDonnell Douglas*, based upon, as discussed more fully below in connection with prong four, plaintiff's membership in a protected class, as well as evidence relating to the circumstances of her employment and her termination.[11] In response, defendants have established a legitimate non-discriminatory reason for her dismissal, namely, their reliance on the recommendation of Dr. Creagh-Kaiser that plaintiff was unsuitable for police work because of the following: (1) plaintiff's "reported level of distress upon entering an elevator and while conducting the [training] scenario poses question for her ability to tolerate the stress of police work"; and (2) "while [plaintiff] denied experiencing difficulty with closed spaces and claustrophobia, the reported actions and behaviors that she took part in are contradictory to the psychological resources required by a police officer." (Defs.' Ex. V; Defs.' Br., at 1-2.) Hence, the Court proceeds directly to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable jury could find discrimination on the basis of race by examining each party's evidence

---

[11] For the purposes of this motion, defendants do not dispute that plaintiff is a member of a protected class, that she performed her job satisfactorily, and that her termination constituted an adverse employment action. Defendants submit that plaintiff cannot satisfy the forth prong of the *prima facie* case – namely, that her termination occurred under circumstances giving rise to an inference of discrimination – and, thus, her claims of discrimination must fail. (Defs.' Br., at 6-7.)

individually and then proceeding to evaluate the evidence as a whole. *See Tomney v. Int'l Ctr. for the Disabled*, 357 F. Supp. 2d 721, 742 (S.D.N.Y. 2005); *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 314 (2d Cir. 1997); *see also Siano v. Haber*, 40 F. Supp. 2d 516, 520 (S.D.N.Y.), *aff'd mem.*, 201 F.3d 432 (2d Cir. 1999); *Lapsley*, 999 F. Supp. at 515.

In response to defendants' motions for summary judgment, plaintiff points to several pieces of evidence in support of her argument that a reasonable jury could find that defendants' proffered non-discriminatory reason for the termination was a pretext for discrimination based on race.[12] More specifically, plaintiff argues that she has evidence that (1) the articulated basis for her termination – that is, that she suffers from claustrophobia, or exhibited symptoms of such a condition – is factually false; (2) the City failed to conduct a reasonable investigation on this issue prior to her termination; and (3) there is disparate treatment between minority recruits and Caucasian recruits at the police academy.

As set forth below, the Court concludes that the evidence relied upon by plaintiff is sufficient to create material issues of fact on this issue and to defeat defendants' summary judgment motion.

(1) Evidence Regarding Inaccuracy of Proffered Reason for Termination

Although defendants contend that they

terminated plaintiff because she exhibited signs of claustrophobia, specifically relating to elevators, plaintiff has submitted substantial evidence that she suffers from no such problem. First, plaintiff has never been treated for any mental condition, including "claustrophobia." (Pl.'s Dep. 31, 63, 131, 134, 157, 169-70, 256, 331.) Second, plaintiff was examined on two occasions by a psychologist, Dr. Robert Daley, who concluded that he "failed to uncover evidence of any significant anxiety disorder or phobia, nor does she suffer from any other discernable psychiatric disturbance" and that, in his opinion, "Ms. Rodriguez is fully mentally competent and suitable for employment as a police officer." (*Id.*) Third, there is other strong evidence in the record that plaintiff had no problems with elevators or confined spaces. For example, not only did plaintiff live on the twenty-first and nineteenth floor of an apartment building for a number of years, but she continued to live in a high-rise building for two years, even after experiencing an incident where she was stuck alone in a malfunctioning elevator. (Pl.'s Ex. A-3.). Furthermore, in her prior employment, she took the elevator every day to work for Cravath, Swaine & Moore on the forty-eighth floor and worked for eighteen months as a supervisor of housekeeping for an assisted-living facility, which involved riding elevators at least three or four times each day. (*Id.*) Moreover, plaintiff worked as a flight attendant for fifteen months, beginning in early 1999. (*Id.*)

In addition to this evidence which suggests no prior history of any claustrophobic condition, plaintiff also has presented evidence that the elevator incident during a training workshop on November

---

[12] Although plaintiff alleges in her complaint discrimination based on not only race, but also color and national origin, those allegations are examined together because the proof is common to all three alleged grounds for discrimination.

19, 2004, when this claustrophobia issue first arose, involved a situation of mistaken identification. In particular, if plaintiff's version of the events of that day is credited and all reasonable inferences are drawn in her favor, a reasonable jury could certainly conclude that statements made by an individual other than plaintiff on the elevator were wrongly attributed to her and, thus, led to plaintiff being incorrectly identified as having problems with elevators or confined spaces.[13]

### (2) The Investigation of Plaintiff's Alleged Claustrophobia

Defendants submit that, even if their determination regarding plaintiff's claustrophobic condition was incorrect, it was based upon Dr. Creagh-Kaiser's recommendation, which was reached after receiving credible information about such a problem provided by multiple sources. Specifically, defendants submit that Dr. Creagh-Kaiser relied on the memoranda that were given to her by security guard Halliday, Sergeant Patel, Police Officer Aquino, and her interview of plaintiff, in making her recommendation to terminate plaintiff based upon the incident during the training session. In her deposition, Dr. Creagh-Kaiser stated that she assumed the truth of Sergeant Patel and Aquino's respective memorandum because they "were members whose duties were to protect the city and they had information that [she] was

---

[13] To the extent defendants attempt to rely on plaintiff's statement to Dr. Creagh-Kaiser regarding an elevator incident while she was pregnant, plaintiff disputes Dr. Creagh-Kaiser's characterization of that conversation and also disputes whether Dr. Creagh-Kaiser relied on that incident in reaching her recommendation.

not privy to at all." (*See* Def.'s Ex. B, at 53.)

However, plaintiff has submitted evidence suggesting that defendants failed to conduct a reasonable investigation before deciding to terminate plaintiff based upon these claustrophobia allegations. First, plaintiff notes that even a cursory investigation and/or review of the reports prepared in connection with the training incident would have revealed that it was not independently corroborated by multiple sources, but was based almost entirely upon conclusions reached by Sergeant Patel based upon incomplete pieces of information provided by others. For example, Officer Halliday testified that she was the officer who witnessed the alleged "claustrophobia" scene on the elevator. She testified that she did not actually know plaintiff's name that day in question. (Defs.' Ex. D, at 17:1-12.) Furthermore, she testified that Sergeant Patel questioned Halliday about the incident, and that Sergeant Patel actually gave another Police Officer's name – not plaintiff's name – when she came down to identify plaintiff. (*Id.*, at 17:14-20.) However, on December 1, 2004, when Halliday wrote her statement as ordered by Sergeant Patel, she put plaintiff's name in that statement. (*Id.*, at 18:9-18.) Halliday testified the only reason she knew plaintiff's name was because Sergeant Patel gave it to her afterwards. (Pl.'s Ex. T, at 61:15-18.) Halliday further testified that she was not sure that plaintiff was the person in the elevator. (Defs.' Ex. D, at 18:19-23.) Halliday also acknowledged that certain portions of her written statement were inaccurate. (*Id.*, at 19:2-5.) Furthermore, Halliday testified that she never had to escort plaintiff into the elevator. (*Id.*, at

19:6-11.) Thus, plaintiff has proffered evidence that the alleged corroboration was simply circular reporting being done at the direction of Sergeant Patel following the alleged claustrophobia incident.

Second, plaintiff argues that Dr. Creagh-Kaiser and Dr. Archibald erred by only taking a layperson assessment of plaintiff's alleged condition, that is, by relying solely on the accounts of Sergeant Patel, Halliday and Aquino. For example, the evidence does not show that Dr. Creagh-Kaiser ever requested plaintiff's other psychological forms indicating that plaintiff is not claustrophobic, and has never before suffered from claustrophobia. As noted above, even a cursory review of plaintiff's prior job as a flight attendant and her use of elevators in connection with her prior jobs (*i.e.*, working on the forty-eighth floor for a law firm and working in a facility as a housekeeping supervisor) and her prior residences (on the twenty-first and nineteenth floors of apartment buildings) would have raised considerable doubt as to whether she feared elevators or suffered from a claustrophobic condition. Moreover, Dr. Creagh-Kaiser conducted an evaluation when plaintiff entered the academy, and found plaintiff to be "psychologically suitable." (Defs.' 56.1 ¶ 3.) In fact, Dr. Creagh-Kaiser even testified that she had concerns with the accounts of the incident and the fact that her analysis was based solely on those accounts.[14] (Pl.'s Ex. AA, at

262-63.)

Based upon this evidence, plaintiff has certainly presented evidence which places in to dispute not only whether she has any claustrophobic condition, but also whether the defendants conducted a reasonable investigation to confirm whether plaintiff suffered from any such condition. However, it is important to emphasize that such factual disputes alone would not necessarily be sufficient to survive summary judgment. Specifically, the Court recognizes that the fact that an employee disagrees with the results of an employer's decision regarding termination, or even has evidence that the decision was objectively incorrect or was based on a faulty investigation, does not automatically demonstrate, by itself, that the employer's proffered reasons are a pretext for termination. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 146-47 (2000) ("The ultimate question is whether the employer intentionally discriminated, and proof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct. In other words, it is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.") (quotations and citations omitted); *see also Rorie v. United Parcel Serv., Inc.*, 151 F.3d 757, 761 (8th Cir. 1998) (stating that "the relevant inquiry was whether [plaintiff] created a genuine issue of material fact as to whether her discharge was gender-based and not whether her termination was reasonable" and noting that "[i]t is not the task of this court to determine whether [the investigator's]

---

[14] Plaintiff also argues in her response papers that during discovery, the plaintiff found out that on January 4, 2004 defendant Archibald asked Dr. Creagh-Kaiser to investigate whether plaintiff's case was a misidentification, but Dr. Creagh-Kaiser never effectively followed through with this investigation. (Pl.'s Opp. Br., at 14 n.8.)

However, plaintiff does not provide the Court with any citation to the record to support that assertion.

investigation was sufficiently thorough or fair"); *Collette v. St. Luke's Roosevelt Hosp.,* No. 99 Civ. 4864 GEL, 2002 WL 31159103, at *3 (S.D.N.Y. Sept. 26, 2002) ("[E]ven if the plaintiff adequately demonstrates the falsity of the employer's explanation for his termination, this is not necessarily enough to survive a motion for summary judgment, because proof that the employer's explanations were false would not necessarily constitute affirmative evidence that the real reason was prohibited discrimination.").

As the Second Circuit has articulated, "(i) evidence satisfying the minimal *McDonnell Douglas* prima facie case, coupled with evidence of falsity of the employer's explanation, may or may not be sufficient to sustain a finding of discrimination; (ii) once the employer has given an explanation, there is no arbitrary rule or presumption as to sufficiency; (iii) the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove – particularly discrimination." *James,* 233 F.3d at 156-157. Thus, in circumstances where the veracity of the employer's explanation and/or the thoroughness of the investigation is disputed, the Court should examine the entire record to determine whether there is evidence from which a reasonable jury could conclude that the deficiencies in the employer's investigation and/or the incorrect conclusion reached by the employer can be attributed to a discriminatory motive. Here, as set forth below, plaintiff has proffered other evidence regarding treatment of minorities in the academy which, if such evidence is credited

and all reasonable inferences are drawn in plaintiff's favor, could provide a sufficient basis, combined with the other evidence outlined above, for a jury to conclude that the articulated reason for termination was a pretext for discrimination.

### (3) Other Evidence of Discrimination

Plaintiff relies on several pieces of evidence regarding disparate treatment of minorities in the academy to demonstrate pretext relating to her termination decision. First, plaintiff relies on a discussion she had with Sergeant Nancy Rosado ("Rosado") after plaintiff was told that she was being placed on "Restricted Duty" and would not graduate with the rest of her class. (Pl.'s Aff. ¶¶ 55, 59.) Plaintiff stated that Rosado told plaintiff in her office that "[t]hese people do not operate in good faith especially with minorities." (Pl.'s Aff. ¶ 61.) Plaintiff further testified that Rosado told her that she has "seen them do some outrageous things to people like, cheating them out of their pensions, or just making things up." (Pl.'s Dep. 74:11-15; Pl.'s Aff. ¶ 61.) According to plaintiff, Rosado also discussed with plaintiff an incident involving a Hispanic female officer that was terminated because she would not lie for her Caucasian male officers accused of serious misconduct, and advised plaintiff to seek legal advice from an attorney because she should not expect a fair investigation. (*Id.*)

Second, plaintiff points to evidence that, during the period she was on restricted duty, she and other minority recruits were treated differently than Caucasian recruits.[15]

---

[15] It is well-settled that a plaintiff can raise an inference of discrimination by showing disparate treatment – namely, that a similarly situated

Plaintiff testified that Zweibel and other police supervisors would order the minority recruits to perform custodial duties in uniform, while the Caucasian recruit officers would perform the same duties in plain clothes. (Pl.'s Ex. OO, at 45-52; QQ, at 116-132.)

Third, plaintiff testified that she was not treated the same as similarly situated C.S., who is a Caucasian male, with respect to how the defendants handled information regarding his alleged prior mental condition. (Pl.'s Dep. 116:9-14.) Plaintiff testified that he lied on his pre-employment application by falsely stating that he had not received treatment for a mental condition, yet he was not fired as plaintiff was. (Defs.' Ex. A, at 85-89.) She also testified that C.S. was also allowed to wear plain clothes and not do any work, while minority holdover recruits were working and were in uniform.

Finally, plaintiff testified about a discussion with former Police Officer Trevor P. Stephenson ("Stephenson") about the treatment of minority recruit officers at the Recruit Training School. Stephenson is an African-American male who plaintiff

claims was terminated twice by defendant City of New York while assigned to the Recruit Training School. (Pl.'s Aff. ¶ 65.) Stephenson accused Lieutenant George Duquette of discriminating against him with unfair discipline while he was in charge of Recruit Operations. (*Id.*) Plaintiff claims that when Lieutenant Duquette saw them talking, he looked at them with disgust. (*Id.*)

In sum, the Court finds defendants' arguments in support of the motion for summary judgment on the discrimination claims to be unpersuasive. Although defendants argue that each allegation does not necessarily provide evidence of discriminatory intent in and of itself, the evidence in the record, when viewed as a whole and in the light most favorable to plaintiff, creates genuine issues of material fact as to whether defendants' stated reason for terminating plaintiff was pretextual, and whether Rodriguez's race, color, or national origin was a factor in the termination decision. In other words, a reasonable factfinder could find that plaintiff was misidentified in connection with the elevator incident that day, and could conclude that the lack of investigation into such a potential misidentification and the termination decision was partly due to reasons other than concerns about plaintiff's alleged claustrophobia – *i.e.*, race, color, or national origin. Moreover, even though defendant has pointed to portions of the record that undermine the strength of various aspects of Rodriguez's proffered evidence of discrimination as it relates to her termination, there is sufficient evidence to create genuine issues of material fact as to whether that termination was pretextual. Accordingly, the evidence is sufficient for

employee outside the protected group received more favorable treatment. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977); *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003); *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999). The law does not require the employees to be similarly situated in all respects, but rather requires that they be similarly situated in all *material* respects. *See McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) ("A plaintiff is not obligated to show disparate treatment of an *identically* situated employee."); *accord Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63-64 (2d Cir. 1997).

Rodriguez to survive defendants' summary judgment motion for her discrimination claims related to the termination.

### C. Hostile Work Environment Claim

Plaintiff also has brought a gender-based hostile work environment claim.[16] Defendants argue that they are entitled to summary judgment on the hostile work environment claim because plaintiff has failed adduce sufficient evidence to establish a *prima facie* case on this claim and survive summary judgment. As set forth below, the Court disagrees.

A hostile work environment, in violation of Title VII, is established by a plaintiff showing that his or her workplace was "permeated with 'discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *accord Terry v. Ashcroft*, 336 F.3d 128, 147 (2d Cir. 2003). "Isolated instances of harassment ordinarily do not rise to this level." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (holding that "simple teasing . . . offhand comments, and isolated incidents (unless extremely serious)" will not amount to discriminatory changes in the "terms and conditions of employment") (internal citations and quotations omitted); *Brennan v. Met. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) (holding that "[i]solated, minor acts or occasional episodes do not warrant relief"); *Williams v. County of Westchester*, 171 F.3d 98, 100 (2d Cir. 1999) (holding that "to meet his burden, the plaintiff must show more than a few isolated incidents" and "evidence solely of sporadic" discrimination does not suffice) (internal quotations omitted); *Knight v. City of New York*, 303 F. Supp. 2d 485, 500 (S.D.N.Y. 2004) (denying hostile work environment claim where incidents were "too remote"); *Ruggieri v. Harrington*, 146 F. Supp. 2d 202, 217-18 (E.D.N.Y. 2001) (holding that a "collection of administrative mixups, minor annoyances, and perceived slights cannot be considered severe or pervasive harassment"); *Francis v. Chem. Banking Corp.*, 62 F. Supp. 2d 948, 959 (E.D.N.Y. 1999) (dismissing hostile work environment claim where plaintiff only alleged four incidents).

The conduct in question must be "severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004). Other factors to consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Terry*, 336 F.3d at 148 (quotation marks omitted). The Second Circuit has noted, however, that "[w]hile the standard for establishing a hostile work environment is high, . . . [t]he environment

---

[16]  Counsel for plaintiff made clear at oral argument that the hostile work environment claim is based solely on gender, while the discrimination claim related to plaintiff's termination is based on race, color, and national origin.

need not be 'unendurable' or 'intolerable.'" *Id.* (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000)). Moreover, although a hostile work environment generally consists of "continuous and concerted" conduct, "a single act can create a hostile work environment if it in fact work[s] a transformation of the plaintiff's workplace." *Feingold*, 366 F.3d at 150 (quotations and citation marks omitted) (alteration in original).

Further, to succeed on a hostile work environment claim in the instant case, plaintiff must link the actions by defendants to her gender. Although "[f]acially neutral incidents may be included, of course, among the 'totality of the circumstances' that courts consider in any hostile work environment claim," plaintiff nevertheless must offer some evidence from which a reasonable jury could infer that the facially-neutral incidents were in fact discriminatory. *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002); *see also Nakis v. Potter*, No. 01-CV-10047 (HBP), 2004 WL 2903718, at *20 (S.D.N.Y. Dec. 15, 2004) (holding that "[h]ostility or unfairness in the workplace that is not the result of discrimination against a protected characteristic is simply not actionable" under Title VII) (citing *Brennan*, 192 F.3d at 318 ("A plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class.")).

In the instant case, plaintiff proffered specific evidence related to her gender. Plaintiff claims she was "forced to perform subservient secretarial and custodial duties" by Zweibel and "his behavior towards [plaintiff] was mean, hostile, yelling, banging on the table, calling me his 'girl'

and invading [her] personal space." (Pl.'s Aff. ¶ 69.) Plaintiff also noted that, "as [her] direct supervisor, he would demean [her] in front of other recruit officers as all other ranking police officers." (*Id.*) For example, plaintiff testified that Zweibel ordered plaintiff to count toilets and run personal errands for him, while calling her "his girl." Plaintiff also recalled taking an elevator with Zweibel to the basement of the NYPD building. In that instance, two officers approached to "see if they can have me assist them in some administrative work." (Pl.'s Dep. 128:8-12.) Zweibel allegedly commented, "don't even look at her. I got her first. She's mine. She's my girl." (*Id.*) Plaintiff further testified in her deposition that he said that on two other occasions. (*Id.* at 128:16-22.)

Plaintiff also testified to the following: (1) on two or three occasions, when Zweibel was not satisfied with plaintiff's work, he would "slam his hand on the table, he would take the documents and throw them right beside me for a sense of intimidation" and said, "'I asked you,'" in a high pitched voice "'to do this'"; (2) Zweibel would "pound on the material" and say, "'And I want this ace up'"; and (3) Zweibel had a hostile attitude. (*See* Defs.' Ex. A, at 125, 128.) Plaintiff also alleges that she was the only female that "was sent to Blooming Farm House and Deli to get Zweibel's lunch" while there were other males, like Nathan Miller – another recruit holdover (Pl.'s Ex. QQ, at 126:10) – doing absolutely nothing, but were never asked to do such tasks. (*Id.*, at 120:11-21.)

Defendants argue that this evidence alone, even if true, would not be sufficiently severe or pervasive to establish a hostile

work environment under well-settled Second Circuit case authority. However, Rodriguez also relies on facially neutral incidents in support of her hostile work environment claim, including the fact that she was expected to do the following: (1) measure and draw floor plans for the police academy; (2) perform custodial work; (3) pick up food for Zweibel on five occasions; (4) answer Zweibel's phone; (5) count toilets, showerheads, and sinks on every floor of the police academy and input the information on a spreadsheet; and (6) redo floor plans that Zweibel rejected on one occasion because they "weren't good enough." (*See* Defs.' Ex. A, at 93-97, 112-115.)

Defendants argue that the Court should not consider these facially neutral incidents because there is no circumstantial evidence or other basis from which a jury could infer these incidents were based on plaintiff's gender. The Court finds that argument unpersuasive and is unable to conclude as a matter of law that these facially neutral incidents should not be considered. Although it is not the only inference that can be drawn from these facts, these facially neutral incidents, in conjunction with the other gender-related comments outlined above, could be consistent with a hostile work environment based on gender. In other words, Rodriguez may be able to prove from the alleged actions that defendants treated women in a manner differently from men as it related to these tasks and, combined with the other alleged behavior, created a hostile work environment for plaintiff. Defendants may be able to prove that all recruits were treated the same way while on restricted duty and that the workplace was not a hostile

environment to women. However, there is sufficient evidence on both sides of this issue to raise an issue of material fact that should be resolved by a jury. Accordingly, defendants' motion is denied as to Rodriguez's hostile work environment claim.

### D. Retaliation

#### 1. Legal Standard

Title VII prohibits an employer from firing an employee in retaliation for having made a charge of discrimination. 42 U.S.C. § 2000e-3(a); *see also* N.Y. Exec. Law § 296(1)(e); N.Y.C. Admin. Code § 8-107(7). "Title VII is violated when 'a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause.'" *Terry*, 336 F.3d at 140-41 (internal citations omitted). To establish a *prima facie* case of retaliation, a plaintiff must show (1) she engaged in a protected activity; (2) defendant was aware of that activity; (3) she suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 66 (2d Cir. 1998); *see Terry*, 336 F.3d at 141. Retaliation claims are similarly governed by the burden-shifting framework set out by the Supreme Court in *McDonnell Douglas*. *Terry*, 336 F.3d at 141 (2d Cir. 2003).

#### 2. Application

The Court finds that plaintiff has made out the *prima facie* case required by *McDonnell Douglas*. It is undisputed that plaintiff filed an EEOC complaint on March

28, 2005, the NYPD was aware of the EEOC complaint, and plaintiff was fired after the complaint was filed.[17]  Defendants, however, argue that there is insufficient evidence of a causal connection between the protected activity and the adverse employment action to survive summary judgment.  As set forth below, the Court disagrees.

It is well settled that if a retaliatory motive played a part in the adverse employment actions, even if it was not the sole cause, the law is violated.  *Sumner,* 899 F.2d at 209 (citing *Davis v. State Univ. of N.Y.*, 802 F.2d 638, 642 (2d Cir. 1986)); *DeCintio*, 821 F.2d at 116 n.8.  Likewise, if the employer was at all motivated by retaliatory animus, the law is violated even if there were objectively valid grounds for the adverse employment action.  *Id.* at 209.  A plaintiff may establish a causal connection between the protected activity and the adverse employment action either through direct evidence of retaliatory animus, or by circumstantial evidence.  *Id.*

Where there is no direct evidence of

retaliatory animus or a showing of disparate treatment of fellow employees who engaged in the same conduct, proof of causation may be shown indirectly, by demonstrating that the protected activity was followed closely by a retaliatory action.  *Gordon v. N. Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000); *Cifra v. GE*, 252 F.3d 205, 217 (2d Cir. 1991) ("[T]he causal connection needed for proof of a retaliation claim 'can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.'") (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (internal citation omitted)); *Sumner*, 899 F.2d at 209 (holding that a causal connection may be "established indirectly with circumstantial evidence, for example, by showing that the protected activity was followed by discriminatory treatment or through evidence of disparate treatment of employees who engaged in similar conduct or directly through evidence of retaliatory animus").  Although the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," *Gorman-Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 554 (2d Cir. 2001), some district courts have generally concluded that "a passage of two months between the protected activity and the adverse employment action seems to be the dividing line."  *Cunningham v. Consol. Edison, Inc.*, No. 03-CV-3522 (CPS), 2006 U.S. Dist. LEXIS 22482, at *55-*56 (E.D.N.Y. Mar. 28, 2006) (collecting cases).  However, because the Second Circuit has found periods well beyond two months to be sufficient to suggest a causal relationship under certain

---

[17]  The term "protected activity" refers to action taken to protest or oppose statutorily prohibited discrimination.  *See* 42 U.S.C. § 2000e-3; *see also Wimmer v. Suffolk County Police Dep't*, 176 F.3d 125, 134-35 (2d Cir. 1991).  Informal as well as formal complaints constitute protected activity.  *See Sumner v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d Cir. 1990).  Moreover, to establish that her activity is protected, Rodriguez "need not prove the merit of [her] underlying discrimination complaint, but only that [s]he was acting under a good faith, reasonable belief that a violation existed." *Sumner*, 899 F.2d at 209; *see also Grant v. Hazelett Strip-Casting Corp.*, 880 F.2d 1564, 1569 (2d Cir. 1989).

circumstances, courts must carefully consider the time lapse in light of the entire record. *See, e.g., Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (holding eight-month gap between EEOC complaint and retaliatory action suggested a causal relationship); *see also Richardson v. N.Y.S. Dep't of Corr. Serv.*, 180 F.3d 426, 446-47 (2d Cir. 1999), *abrogated on other grounds*, *Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006) (holding abusive acts within one month of receipt of deposition notices may be retaliation for initiation of lawsuit more than one year earlier).

Defendants argue that plaintiff cannot establish a *prima facie* case for retaliation because the recommendation to terminate plaintiff's probationary employment was made on March 3, 2005, more than three weeks prior to the date of plaintiff's protected activity. Although defendants acknowledge that plaintiff's termination took place after plaintiff's EEOC complaint was filed, defendants contend that the timing was simply attributable to the fact that the recommendation had to move through the chain of command. Here, under the circumstances of this case (discussed more in-depth *supra*), the Court concludes that plaintiff's filing of the EEOC complaint was followed closely by plaintiff's termination, thereby satisfying plaintiff's minimal burden of establishing a *prima facie* case as it relates to the issue of causation. The fact that the initial recommendation for termination may have preceded the protected activity is not dispositive given (1) that it is undisputed that the final termination decision was not made until after the protected activity and (2) the other evidence of causation,

including a comment by a Lieutenant, described below.

Having found that plaintiff has met her *prima facie* case, the Court proceeds to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable jury could find retaliation. As described above in analyzing the claims related to termination, defendants have articulated a legitimate, nondiscriminatory reason for terminating plaintiff, contending that, based on the circumstances leading to her firing, plaintiff's "level of distress upon entering an elevator and while conducting [a] scenario" at an NYPD training session rendered her unsuitable to the demands of police work. Notwithstanding defendant's nondiscriminatory reason for terminating plaintiff, defendant's motion for summary judgment as to plaintiff's retaliation claim is denied. As set forth below, there are issues of fact as to whether plaintiff was fired because plaintiff had engaged in a protected activity.

Plaintiff asserts that the reason plaintiff was terminated was because she had filed a discrimination claim with the EEOC. In support of that argument, plaintiff points to the fact that, not only was the termination closely connected in time to the EEOC filing, but that she was treated differently from a similarly situated former employee who was not terminated. In particular, as noted *supra,* plaintiff provides evidence that C.S. was given preferential treatment by the defendants with respect to his investigation even though he also allegedly lied on his pre-employment application about receiving treatment for a mental condition. For instance, she testified that he was allowed or offered at least three GO-15s during the

period of time that plaintiff was there. (Pl.'s QQ, at 116.) Courts have consistently held that one way to establish a claim of retaliation is to show that the complaining employee is treated differently than other employees who did not engage in a protected activity. *See Knight v. City of New York*, 303 F. Supp. 2d 485, 498-99 (S.D.N.Y. 2004); *see also DeCintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987) (holding that discrimination can be established "through other evidence such as disparate treatment of fellow employees who engaged in similar conduct"). Although defendant has presented an explanation as to why plaintiff's withholding of a mental condition was handled differently than C.S.'s situation, a reasonable jury could find, based on this evidence, that at least one reason Rodriguez's alleged prior condition was handled in this manner was in retaliation for her filing an EEOC complaint.

Plaintiff further points to the Latino Officer's Association's ("LOA") attempt to file an OEEO complaint, which occurred prior to plaintiff's filing with the EEOC and for which a reasonable jury could also infer defendants' intent of retaliating against plaintiff. On December 30, 2004, plaintiff and First Vice President of the LOA, Robert Gonzalez ("Gonzalez"), attempted to file an OEEO complaint with Lieutenant Wahlig and Sergeant Moore. (Pl.'s Aff. ¶ 63.) Plaintiff alleges that Lieutenant Wahlig advised the plaintiff that it was not a good idea to file any complaint. (*Id.*) Although there are no documents reflecting Lieutenant Wahlig's involvement in the termination decision, the absence of such evidence does not preclude plaintiff from arguing, given his position, that he had some knowledge of the decision-making process. It is certainly possible that Lieutenant Wahlig's statement to plaintiff may have been entirely lacking in personal knowledge as to plaintiff's termination. However, the Court is not permitted to make such credibility determinations on summary judgment and must view the evidence in the light most favorable to plaintiff, including giving her the benefit of all reasonable inferences from such evidence. Under that standard, the statement by Lieutenant Wahlig, combined with the other evidence that could suggest that plaintiff's termination was in part motivated by retaliation for her protected activity while at the NYPD, is sufficient to create a material issue of disputed fact on the issue of pretext that must be submitted to a jury. Accordingly, the defendants' motion for summary judgment on the retaliation claims is denied.

### E. ADA Claim

Plaintiff also claims that defendants discriminated against her in violation of the ADA on the basis of a perceived disability. Specifically, plaintiff contends that she has a "regarded as disabled" claim against the City based upon their perception that she suffered from claustrophobia. As set forth below, the Court concludes that plaintiff's ADA claim cannot survive summary judgment.[18]

---

[18] As a threshold matter, the Court finds that an ADA claim cannot be asserted because plaintiff did not check the box for an ADA claim in her filing with the EEOC or otherwise indicate in any way that she was seeking to assert a claim under the ADA. *See* 42 U.S.C. §§ 2000e-5(e)(1). Moreover, a "regarded as disabled" claim based on claustrophobia would not be reasonably expected to grow out of discrimination claims

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . the discharge of employees, employee compensation, . . . and other terms, conditions, and privileges of employment." *Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 122 (2d Cir. 2004) (quoting 42 U.S.C. § 12112(a)). To establish a *prima facie* case of discriminatory discharge under the ADA, an employee has the burden to demonstrate that: "1) he was an 'individual who has a disability' within the meaning of the statute; 2) the employer had notice of his disability; 3) he could perform the essential functions of the job with reasonable accommodation; and 4) the employer refused to make such accommodation." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 332 (2d Cir. 2000). If plaintiff establishes a *prima facie* case, the burden shifts to the employer "to demonstrate that the employee's proposed accommodation would have resulted in undue hardship." *Id.* Accordingly, if plaintiff is not "disabled," as defined by the statute, then she is not entitled to the protections of the ADA and her claim must be dismissed.

The ADA defines "disability" as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). Plaintiff readily concedes that she is not disabled as defined in subsections (A) and (B) of the statute. Instead, plaintiff claims she qualifies under the statute as disabled based on the third subsection – namely, that she was perceived as having a disability that substantially limits one or more of the major life activities of such individual. (Compl. ¶ 47.) Specifically, plaintiff alleges that defendants regarded her as suffering from a significant mental disability due to "claustrophobia." (Pl.'s Br., at 21-22, n.12.) Defendants contend that plaintiff's claim must be dismissed because plaintiff cannot establish that defendants regarded her as having a physical or mental impairment that substantially limited a major life activity. (Defs.' Br., at 19, n.10.)

The Second Circuit has not yet ruled on whether claustrophobia is a condition that constitutes a disability under the ADA. Therefore, this is a novel issue before this Court. The Second Circuit has, however, rejected a claim that panic attacks with agoraphobia constitute a disability under the ADA. *See Reeves v. Johnson Controls World Servs, Inc.*, 140 F.3d 144, 154 (2d Cir. 1998). Defendants also have cited to a variety of other federal courts that have reviewed the question of whether a plaintiff who claims to suffer from claustrophobia, or alleges that he or she was regarded as

---

based on race, color, and national origin, or a hostile work environment claim based on gender. *See, e.g., Williams v. N.Y.C. Hous. Auth.,* 458 F.3d 67, 70 (2d Cir. 2006) ("[A] claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made."). In any event, even if this claim had been timely exhausted with the EEOC, it would fail for the reasons outlined *infra.*

suffering from claustrophobia, established a disability under the ADA. In these cases, after an individualized determination of the factual record, the courts determined that the alleged claustrophobia did not meet the definition of disability under the ADA. *See, e.g., Hall v. Claussen*, 6 Fed. Appx. 655, 662-63 (10th Cir. Mar. 6, 2001) (refusing to challenge on appeal district court's finding that claustrophobia was not a disability under ADA); *Lanterman v. Columbia Gas of Ohio*, No. 01 CO 54, 2002 Ohio App. LEXIS 5269, at *10 (Ohio Ct. App. Sept. 27, 2002) (holding that claustrophobia does not qualify as a disability under ADA). Therefore, the Court must make a determination in this particular case as to whether a reasonable jury could conclude that plaintiff's perceived claustrophobic condition qualifies as a disability under the ADA.

After carefully analyzing the evidence in this case, the Court finds that plaintiff cannot make a successful *prima facie* case because no reasonable jury could find that she was perceived as being a "qualified individual with a disability" within the meaning of the ADA. If plaintiff was terminated because of her perceived claustrophobic condition, there is absolutely no evidence that the defendants believed she was unable to work in either "a class of jobs or a broad range of jobs." 29 C.F.R. § 1630.2(j)(3)(i); rather, assuming she was in fact terminated for this perceived condition, the only evidence in the record on this issue is that the recommendation for termination was based on her perceived inability to perform *the specialized duties of a police officer* because of the condition. In other words, there is no evidence that defendants perceived her as being substantially limited

in a major life activity. Therefore, given the lack of such evidence, summary judgment on the ADA claim is warranted.

In reaching this decision, the Court finds the district court's analysis in *Walker v. Town of Greeneville*. 347 F. Supp. 2d 566, 573 (E.D. Tenn. 2004), to be persuasive authority. In *Walker*, the court examined, among other things, whether plaintiff firefighter, whom his employer believed suffered from a claustrophobic condition, could bring a "regarded as disabled" claim under the ADA. The court concluded that such a claim could not survive summary judgment because the employer had only determined that plaintiff could not satisfy the particular job requirements of a firefighter and reached no conclusion that the condition substantially limited a major life activity:

> [T]here is no evidence in the record that the defendants held any mistaken belief about plaintiff's ability to think, to concentrate, or to perform manual tasks. At most, the record demonstrates that the defendants believed plaintiff could not satisfy the requirements of the job of firefighter because he could not enter burning buildings or confined spaces. *See Cotter v. Ajilon Servs., Inc.,* 287 F.3d 593, 599 (6th Cir. 2002) ("an employer does not necessarily regard an employee as disabled 'simply by finding the employee to be incapable of satisfying the singular demands of a particular job'") (quoting *Kocsis v. Multi-Care Management, Inc.,* 97 F.3d 876, 885 (6th Cir. 1996)). The Court finds that there is insufficient

evidence to show that plaintiff was regarded as disabled.

*Walker,* 347 F. Supp. 2d at 573. As in *Walker*, the record in this case demonstrates that the defendants, at best, believed plaintiff could not perform the necessary requirements of her job as a police officer because she could not enter confined spaces. Thus, there is insufficient evidence in the record for a reasonable jury to conclude that plaintiff was "regarded as disabled" under the ADA. Accordingly, defendants' motion for summary judgment on plaintiff's ADA claim is granted.

## F. Municipal Liability

Defendants move for summary judgment on the claim of municipal liability against the City of New York and the individual defendants in their official capacities on the grounds that this claim is merely conclusory and that plaintiff has not provided any evidence that her civil rights were violated as a result of a municipal policy or custom.

Section 1983 actions against officials in their official capacities "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Plaintiff's suit against the individual defendants in their official capacities is therefore, effectively a suit against the City of New York. *See Walton v. Safir*, 122 F. Supp. 2d 466, 477 (S.D.N.Y. 2000) (holding plaintiff's claim against Police Commissioner is duplicative of her claim against the City of New York); *Davis v. City of New York*, No. 00 CIV 4309 (SAS), 2000 WL 1877045, at *8 (S.D.N.Y. Dec. 17, 2000) (holding that an official-

capacity suit against former Commissioner is deemed a claim against the City itself).

The Supreme Court expressly rejected liability pursuant to a theory of respondeat superior for purposes of § 1983 in *Monell*. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable solely because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."). Thus, "[a] municipality will not be held liable under § 1983 unless plaintiffs can demonstrate that the allegedly unconstitutional action of an individual law enforcement official was taken pursuant to a policy or custom officially adopted and promulgated by that [municipality's] officers." *Abreu v. City of New York*, No. 04-CV-1721, 2006 U.S. Dist. LEXIS 6505, at *11 (E.D.N.Y. Feb. 22, 2006) (quotation marks omitted) (citing *Monell*, 436 U.S. at 690). "[M]unicipal liability under § 1983 attaches where-and only where-a deliberate choice to follow a course of action is made from among various alternatives" by the municipality's lawmakers. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986)). An individual's misconduct will not result in respondeat superior liability for his supervisors absent specific allegations that he acted pursuant to an official policy or custom. *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991). In particular, "'the mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.'" *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting *Dwares v. City of New*

*York*, 985 F.2d 94, 100 (2d Cir. 1993)). The plaintiff in a Section 1983 claim bears the burden of establishing municipal liability. *See Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985), *cert. denied*, 480 U.S. 916 (1987).

The Court finds that plaintiff has not provided sufficient evidence to survive a motion for summary judgment on a claim for municipal liability. Instead, plaintiff relies on conclusory allegations, such as "[d]efendants acted in an outrageous and systematic pattern of . . . discrimination, oppression, bad faith and cover-up, directed at plaintiff . . ." (Complaint, at ¶ 100.) The Court finds no support in the depositions, affidavits, reports, or exhibits submitted to the Court for the alleged conclusory allegations of municipal liability. As there is no evidence of a policy or custom promulgated by the City, the Court grants defendants' summary judgment motion as it relates to municipal liability against the City and against the individual defendants in their official capacities.[19]

### G. Section 1983 Claims[20]

Plaintiff alleges, pursuant to Section 1983, that her constitutional rights under the Equal Protection Clause, as well as her right to be protected against a Section 1983 hostile work environment, were violated by the defendants, including the individual defendants in their individual capacity. Defendants argue that the individual capacity claims against a number of the defendants should be dismissed because there is no evidence of their personal involvement in the alleged discriminatory acts and/or there is no evidence that their acts were motivated by discrimination. As set forth below, the Court concludes that, with the exception of defendants Archibald, Patel, and Zweibel, summary judgment is warranted on the Section 1983 claims against the other defendants in their individual capacity.

Under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges or immunities secured by the Constitution and federal law, (2) by a person acting under the color of state law. 42 U.S.C. § 1983. Section 1983 does not itself provide substantive rights, but in fact offers "a method for vindicating federal rights elsewhere conferred." *Patterson*, 375 F.3d at 225 (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) ("Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the

---

[19] To the extent plaintiff has asserted a municipal liability claim against the City under Section 1981, defendants' motion for summary judgment on that claim is granted for the same reasons. *See, e.g., Payami v. City of New York*, No. 03 Civ. 2785 (LAP), 2007 WL 945529, *8 (S.D.N.Y. Mar. 28, 2007) ("When the defendant sued under 42 U.S.C. § 1981 is a municipality . . . a plaintiff must also show that the claimed violations of his or her constitutional rights occurred as a result of a municipal policy or custom.") (citations and quotations omitted).

[20] To the extent defendants move under Section 1983 on the same grounds as under Title VII in connection with their assertion that there insufficient evidence of discrimination to survive summary judgment, the motion is denied for the reasons set forth *supra* with respect to Title VII.

deprivation of rights established elsewhere.") (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)). "'A Title VII plaintiff is not precluded from bringing a concurrent § 1983 cause of action,' such as a claim for denial of equal protection, 'so long as the § 1983 claim is based on a distinct violation of a constitutional right.'" *Patterson*, 375 F.3d at 225 (quoting *Gierlinger v. N.Y. State Police*, 15 F.3d 32, 34 (2d Cir. 1994) and citing *Saulpaugh v. Monroe Comm. Hosp.*, 4 F.3d 134, 143 (2d Cir. 1993)).

Plaintiff asserts violations of her rights under the Equal Protection Clause of the Fourteenth Amendment, which provides that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Constit. amend. XIV, § 1. To state a claim of discrimination under the Equal Protection Clause, a plaintiff must allege that a government actor intentionally discriminated against her on the basis of her membership in a protected class. *Linder v. City of New York*, 263 F. Supp. 2d 585, 592 (E.D.N.Y. 2003) (citing *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000)).

While "Title VII claims are not cognizable against individuals, individuals may be held liable under . . . [§] 1983 for certain types of discriminatory acts, including those giving rise to a hostile work environment." *Patterson*, 375 F.3d at 226 (citing *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 753-54 (2d Cir. 2003)) (additional citation omitted). Furthermore, a plaintiff must demonstrate a defendant's personal involvement in the alleged discrimination in order to establish a claim against such defendant in his individual capacity. *Id.* at

229.

To establish a hostile-work environment claim under Section 1983, a plaintiff must demonstrate that (1) she was intentionally harassed; (2) the harassment was based on her race or gender; (3) such actions were taken under color of state law; and (4) the harassment was so severe as to render the work environment hostile to her. *Id.* (citing *Cohen v. Litt*, 906 F. Supp. 957, 964 (S.D.N.Y. 1995)).

Defendants Kelly, Zeigler, Pineiro, and Pizzuti are entitled to summary judgment in their individual capacities because there is no evidence of their personal involvement as to plaintiff's case, other than their approval of the employment decision in reliance on the observations and recommendations of the doctors and officers directly in contact with her. There is also no evidence that these particular defendants acted with discriminatory animus towards plaintiff. Based on the evidence presented, the Court concludes that defendants Kelly, Seigler, Pineiro, and Pizzuti have satisfied their burden of showing an absence of evidence in support of plaintiff's conclusory claim of individual liability against them under Section 1983. Plaintiff has not even attempted to come forth, as required, with any evidence that might create a genuine issue for trial concerning the liability of these individual defendants. *See, e.g., Davis v. City of New York*, No. 86 Civ. 6345 (SWK), 1990 WL 165763, at *15-*18 (S.D.N.Y. 1990) (granting partial summary judgment where record lacked evidence supporting conclusory claim that a scheme to demote plaintiff originated from supervisory police officers). Accordingly, the Court grants defendants' motion for

summary judgment as it relates to defendants Kelly, Zeigler, Pineiro, and Pizzuti on the Section 1983 claims.[21]

However, the individual Section 1983 claims against defendants Zweibel, Patel, and Archibald will remain because plaintiff has set forth evidence regarding their personal involvement in the alleged discriminatory acts, as set forth *supra*.[22]

---

[21] For the same reason, any other claims asserted against these defendants in their individual capacity are also dismissed.

[22] Defendants also argue, in a one-sentence footnote, that certain individual defendants, including defendant Archibald, should be entitled to qualified immunity with respect to the Section 1983 claim. (Defs.' Br., at 20 n.11.) However, given the factual disputes in the current record, the Court cannot conclude that the remaining individual defendants are entitled to qualified immunity. "Qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Mandell v. County of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003). The Second Circuit has held that "a right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004). This analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (internal citations omitted). Here, if the factual disputes are all resolved in plaintiff's favor and the jury concludes that the remaining

*See, e.g., Hayut,* 352 F.3d at 744 ("Section 1983 sexual harassment claims that are based on a 'hostile environment' theory, . . . are governed by traditional Title VII 'hostile environment' jurisprudence.") (citations omitted); *Patterson*, 375 F.3d at 226 (regarding additional "intentionality" requirement of Section 1983).

b. Section 1983 Conspiracy Claim

Defendants argue for dismissal of plaintiff's conspiracy claim under Section 1983 on the basis of the intracorporate conspiracy doctrine. For the reasons set forth below, the Court agrees and dismisses plaintiffs' conspiracy claims.[23]

---

individual defendants intentionally discriminated against her and created a hostile work environment under Section 1983, qualified immunity would not protect the individual defendants. *See, e.g., Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107,130 (2d Cir. 2004) ("We find that the two remaining individual defendants in this case are not entitled to qualified immunity. It was eminently clear by 2001, when the alleged discrimination took place, both that individuals have a constitutional right to be free from sex discrimination, and that adverse actions taken on the basis of gender stereotypes can constitute sex discrimination."); *see generally Iqbal v. Hasty,* 490 F.3d 143, 174 (2d Cir. 2007) (concluding that plaintiff's racial, ethnic, and religious discrimination claims could not be dismissed on qualified immunity grounds given allegations in complaint). Therefore, summary judgment based on qualified immunity is unwarranted at this stage in the litigation.

[23] Because the Court dismisses the conspiracy claims on the basis of the intra-corporate conspiracy doctrine, the Court need not address defendants' argument that these claims should be dismissed because the allegations of conspiracy are merely conclusory. *See, e.g., Salgado v. City*

The intracorporate conspiracy doctrine posits that the officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other. *See, e.g., Farbstein v. Hicksville Pub. Library*, No. 06-0907-cv, 2007 U.S. App. LEXIS 26491, at *3-*4 (2d Cir. Nov. 15, 2007) (affirming dismissal of conspiracy complaint "at the first step of analysis" because complaint made reference only to employees of same corporation) (citing *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978)); *Herrmann*, 576 F.2d at 459 ("[T]here is no conspiracy [under Section 1985] if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own ... officers[ ] and employees, each acting within the scope of his employment."); *Cameron v. Church*, 253 F. Supp. 2d 611, 623 (S.D.N.Y. 2003); *Quinn v. Nassau County Police Dep't*, 53 F. Supp. 2d 347, 359-60 (E.D.N.Y. 1999); *Rini v. Zwirn*, 886 F. Supp. 270, 292 (E.D.N.Y. 1995) ("Intracorporate immunity has also been extended to the context of conspiracies between a public entity and its employees."). Moreover, to show that defendants acted outside the scope of their employment, a plaintiff must show that defendants were "acting in their personal interests, wholly and separately from the corporation" or municipal entity. *Bhatia v.*

---

*of New York*, No. 00 Civ. 3667, 2001 U.S. Dist. LEXIS 3196, at *24-*25 (S.D.N.Y. Mar. 26, 2001) (granting motion to dismiss Section 1983 conspiracy claim where pleading "merely states the legal standard [for the personal stake exception] without alleging specific facts giving rise to an inference that the standard has been satisfied").

*Yale Univ.*, No. 3:06-cv-1769, 2007 U.S. Dist. LEXIS 73849, at *4-*5 (D. Conn. Sept. 30, 2007) (citing *Tardd v. Brookhaven Nat'l Lab.*, 407 F. Supp. 2d 404, 414 (E.D.N.Y. 2006)); *see also Little v. City of New York*, 487 F. Supp. 2d 426, 442 (S.D.N.Y. 2007) (dismissing conspiracy claims under Sections 1983 and 1985 under intracorporate conspiracy doctrine where plaintiff "does not provide any evidence to suggest that [defendants] were motivated by an independent personal stake in his arrest and prosecution"). Here, plaintiffs do not address defendants' argument that defendants are all employees of a single municipal entity – the New York City Police Department. The Court has carefully reviewed the evidence, or lack thereof, and finds that plaintiff has failed to provide any evidence that defendants were acting solely in their personal interests, separate and apart from their duties as employees of the NYPD. Thus, the Court dismisses the claims of conspiracy under Section 1983.

### III. CONCLUSION

For the reasons set forth above, defendants' motion is GRANTED with respect to the ADA claim and municipal liability claims against the City, the Section 1983 conspiracy claim, the official capacity claims against all defendants, and all claims against defendants Kelly, Zeigler, Pineiro and Pizzuti. Defendants' motion is DENIED with respect to the Title VII and pendent state law discrimination claims against the City, and the Section 1981 and 1983 claims, as well as the pendent state law discrimination claims, against defendants Archibald, Zweibel and Patel, in their individual capacity.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: February 11, 2008
Central Islip, New York

* * *

Attorney for plaintiff is Eric Sanders, Esq., of Jeffrey L. Goldberg, P.C., 2001 Marcus Avenue, Suite S160, Lake Success, NY, 11042. Attorney for defendants' is Blanche Greenfield, Esq., Assistant Corporation Counsel of the City of New York, 100 Church Street, New York, NY, 10007.